U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2019 JUN 13 PM 2: 22

CLERK
BY_____ UAW
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

PENNY WITHERBEE,                    )
                                    )
        Plaintiff,                  )
                                    )
        v.                          )        Case No. 2:18-cv-00113
                                    )
TOWN OF BRATTLEBORO,                )
BRATTLEBORO POLICE DEPT.,           )
PATRICK M. MORELAND,                )
MARK E. CARIGNAN,                   )
MICHAEL R. FITZGERALD, AND          )
PETER ELWELL,                       )
                                    )
        Defendants.                 )

**OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART DEFENDANTS'**
**MOTIONS TO DISMISS THE AMENDED COMPLAINT**
(Docs. 22, 35, 36, 37, 38, 39, 40)

Plaintiff Penny Witherbee, a former employee of the Brattleboro Police

Department ("Brattleboro PD"), brings this action against the Town of Brattleboro (the

"Town"), Brattleboro PD, Assistant Town Manager Patrick M. Moreland, Captain Mark

E. Carignan, Chief of Police Michael R. Fitzgerald, and Town Manager Peter Elwell

(collectively "Defendants"), alleging claims of unlawful sex discrimination in violation

of Title VII, 42 U.S.C. § 2000e-2, and of the Vermont Fair Employment Practices Act, 21

V.S.A. §§ 495 and 495h ("VFEPA").

Plaintiff filed her initial Complaint on July 16, 2018, and an Amended Complaint

on September 28, 2018. In October and November 2018, Defendants moved to dismiss.

(Docs. 22, 35, 36, 37, 38, 39, 40.) Plaintiff opposed the motions on December 13, 2018.

Defendants replied on December 27, 2018, at which time the court took the pending

motions under advisement. Plaintiff has withdrawn her claims against Brattleboro PD

because she concedes that the Town is the real party in interest. Accordingly, all claims against Brattleboro PD are hereby DISMISSED.

Plaintiff is represented by Susan T. Edwards, Esq. and Stanley J. Silverstone, Esq. The Town, Brattleboro PD, and Defendants Fitzgerald and Elwell are represented by Brian P. Monaghan, Esq. and James F. Conway, Esq. Defendant Moreland is represented by Kaveh S. Shahi, Esq. Defendant Carignan is represented by Constance T. Pell, Esq.

## I.    Allegations of the Amended Complaint.

Plaintiff was hired in 2002 as a Brattleboro PD patrol officer and resigned on August 10, 2018, after having reached the rank of sergeant. She alleges that she "immediately observed that the type of calls she was assigned were influenced by her gender in that she would be denied allocation of violent calls in favor of domestic calls." (Doc. 18 at 3-4, ¶ 22.) She asserts Brattleboro PD's then Chief of Police told her that "if a male you are arresting does not want a female to handcuff him, have a male officer do it[.]" *Id.* at 4, ¶ 23 (internal quotation marks omitted). Plaintiff was assigned to share a desk with Defendant Fitzgerald, who was at the time a patrol officer. He allegedly stated that he would consent to share with Plaintiff but did not want any "girly stuff" on his desk. *Id.* at 4, ¶ 24 (internal quotation marks omitted). Plaintiff was assigned a dressing area in the locker room next to another female officer and contends that, throughout her tenure at Brattleboro PD, the area of the dressing room where the two women changed was regularly and openly referred to as "the twat cave" by their colleagues and supervisors. *Id.* at 4, ¶ 25 (internal quotation marks omitted).

While employed at Brattleboro PD, Plaintiff alleges she was informed she was not welcome at the social hunting event male officers attended but instead should join the social group of the police officers' wives. Plaintiff further asserts that her male colleagues regularly discussed the size and attractiveness of women's breasts in her presence and stated they would like to "stick it in" certain women. *Id.* at 4, ¶ 28 (internal quotation marks omitted). Throughout her employment at Brattleboro PD, Plaintiff contends that Officer Amy Hamilton was regularly referred to as "Amy Cameltoe," an apparent reference to her genitalia being visible through her clothing. On one occasion, a

2

male colleague wore a baseball hat to work depicting a woman's breasts. Defendant Fitzgerald, at that time the Chief of Police, initially condoned this behavior but reversed his position after realizing a female was present. Defendant Carignan was allegedly aware of the sexist behavior and remarks made by Plaintiff's fellow male officers but did nothing in response. Plaintiff also alleges that in July 2003, then Officer Carignan pushed her up against a wall and attempted to touch and kiss her against her will.

On December 7, 2013, the day after Plaintiff responded to a hit and run motor vehicle accident, Defendant Moreland approached Plaintiff "purportedly to ask how she was coping after attending the accident scene[,]" *id.* at ¶ 36, and during that conversation he pulled her toward him and kissed her against her will. Plaintiff alleges that Officer David Ceretto witnessed this encounter. Plaintiff claims she immediately reported this incident to Lieutenant Carrier, Dispatcher Stires, and Dispatcher Marrero. Later that same day, Plaintiff was in the parking lot at the Brattleboro PD police station and Defendant Moreland was standing by her vehicle. Approximately thirty minutes later, Plaintiff reentered the parking lot where Defendant Moreland remained. He kissed his hand and twice blew her a kiss. Plaintiff alleges Dispatcher Stires witnessed this conduct. Plaintiff reported this incident to Lieutenants Kirkpatrick, Evans, and Perkins.

Plaintiff alleges that on January 2, 2014, she was speaking with Defendant Carignan when Defendant Moreland approached and greeted Plaintiff by saying "hello sweetheart." (Doc. 18 at 6, ¶ 44) (internal quotation marks omitted). Plaintiff informed Defendant Carignan that this made her uncomfortable.

On January 29, 2014, Plaintiff attended a training event and during the lunch break Defendant Moreland allegedly stroked his hand up and down her back multiple times. Plaintiff reported this incident to Defendant Carignan and Lieutenants Evans, Kirkpatrick, and Perkins. Plaintiff alleges that supervisors did not respond to her complaints and that she became the "butt of their jokes" as they referred to Defendant Moreland as "her boyfriend." *Id.* at 6-7, ¶ 51 (internal quotation marks omitted). Plaintiff states that she feared she would suffer repercussions if she attempted to further pursue her concerns.

3

On or about February 6, 2014, Plaintiff raised her concerns with then Chief of Police Eugene M. Wrinn. He instructed her to provide a written list of her concerns and she did so.

In March 2014, Plaintiff attended a mediation session with Defendant Moreland during which he apologized to her and thereafter "ceased sexually harassing Plaintiff[.]" *Id.* at 7, ¶ 55. She alleges "[u]pon information and belief [Defendant] Moreland did not suffer any disciplinary consequence for his behavior." *Id.* at 7, ¶ 56. Defendant Moreland is now the Town's Assistant Manager. Until her resignation in August 2018, Plaintiff alleges she was forced to interact with Defendant Moreland as part of her employment. Plaintiff contends that the supervisors who failed to respond to her complaints regarding Defendant Moreland did not receive any disciplinary consequences as a result.

In 2008, Plaintiff applied for a promotion to the rank of sergeant and received that promotion. Other members of the Brattleboro PD allegedly complained that Plaintiff was only promoted because of her gender. Plaintiff asserts that the misogynistic attitudes of her supervisors and colleagues made it difficult for her to act in a supervisory role. She complained to Lieutenant Evans regarding the alleged "openly misogynistic and insubordinate attitudes of her inferior officers but he did not take any action." *Id.* at 8, ¶ 63.

In 2010, Lieutenant Evans allegedly instructed Plaintiff to truthfully inform a judge that a delay in applying for a search warrant had been caused by delays in the State's Attorney's Office. Defendant Fitzgerald was angered by Plaintiff placing the blame on the State's Attorney's Office and refused to believe that Plaintiff had been following the order of Lieutenant Evans in doing so even after Lieutenant Evans confirmed her report. Plaintiff alleges that Defendant Fitzgerald then demoted Plaintiff from her position as detective sergeant but did not discipline Lieutenant Evans. Plaintiff later discovered that Defendant Fitzgerald had agreed to fill her former detective sergeant position with a male colleague prior to the incident with the court. Thereafter, Plaintiff successfully grieved the demotion and was returned to the rank of sergeant. Plaintiff,

4

however, was not restored to the detective position which was retained by the male officer who replaced her.

On or about April 5, 2016, Plaintiff was promoted to the rank of lieutenant on a probationary basis. On or about May 5, 2016, during the probationary period, her promotion was cancelled, and she was demoted to sergeant.[1] Plaintiff alleges she was provided reasons for her demotion which included failing to ensure that subordinate officers completed their daily case descriptions before finishing their shifts. Plaintiff alleges that this "failure" is "commonplace and that none of the male supervisors have incurred a disciplinary consequence for failing to correct this behavior." *Id.* at 8-9, ¶ 73 (internal quotation marks omitted). Plaintiff further contends that the reasons for her demotion were pretextual because they were not consistent with the evaluations of her performance during the probationary period. Plaintiff asserts that she was informed her demotion was further attributable to her failure to improve the performance of a subordinate officer. Plaintiff claims Brattleboro PD records demonstrate that this subordinate officer's performance was worse under male supervision, but that none of the male supervisors was disciplined or demoted. Plaintiff alleges that Defendant Elwell approved her demotion to sergeant and personally approved of all of the allegedly discriminatory discipline imposed on her.

On or about July 14, 2016, Defendant Carignan placed an open-ended five-day notification restriction on Plaintiff's eligibility to adjust her work schedule because two of her subordinate officers had finished their shifts without completing a daily report. Plaintiff alleges that similarly situated male supervisors were not subjected to discipline on the same grounds. Plaintiff allegedly "frequently asked [Defendant] Carignan to

---

[1] The Town disputes this characterization, noting that a "reversion following the end of a probationary promotion is not the same as a demotion under the governing collective bargaining agreement." (Doc. 36-1 at 4 n.4.) The court does not resolve factual disputes when adjudicating a motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 696 (2009) ("*Twombly* does not require a court at the motion-to-dismiss stage to consider whether the factual allegations are probably true. We made it clear, on the contrary, that a court must take the allegations as true, no matter how skeptical the court may be.").

rescind the restriction but she did not receive a meaningful answer for the next eleven months." *Id.* at 10, ¶ 82.

On June 6, 2017, Plaintiff informed Defendant Fitzgerald that she was in the process of complaining to the Equal Employment Opportunity Commission ("EEOC") regarding the unlawful discrimination to which she had been subjected. The restriction on her ability to adjust her work schedule was immediately rescinded "without adequate explanation." *Id.* at 10, ¶ 84.

On March 20, 2017, Plaintiff alleges she was forced to undergo a full internal affairs investigation regarding the shooting of a cat that she suspected was rabid. She contends that male officers who have shot suspected rabid animals have not been subjected to an investigation.

Defendant Carignan informed Plaintiff, on or about November 9, 2016, that she had made mistakes and instructed her supervising lieutenant to "counsel" her regarding the mistakes. *Id.* at 10, ¶ 87 (internal quotation marks omitted). Plaintiff met with her supervising lieutenant and they agreed she was not the sergeant who had made the mistakes in question. Defendant Carignan was informed that a different sergeant was responsible for those mistakes, but he allegedly continued to refer to them as examples of Plaintiff's poor job performance.

Defendant Fitzgerald ordered Plaintiff to meet with him and Defendant Carignan regarding her use of sick leave. At a May 1, 2017 meeting, Plaintiff attempted to respond to Defendant Carignan's questions, but he allegedly "became enraged and abusive and accused Plaintiff of being 'a liar' adding that 'even though I have no way of proving it, I'm going to call it what it is, it's bullshit.'" *Id.* at 10-11, ¶ 92. Defendants Fitzgerald and Carignan then allegedly subjected Plaintiff to verbal abuse which culminated in Defendant Fitzgerald shouting at Plaintiff to "get the fuck out of my office." *Id.* at 11, ¶ 93 (internal quotation marks omitted). Following this encounter, Plaintiff was visibly distressed and, as she left the meeting, crying in view of her colleagues and subordinate officers.

On or about March 9, 2017, Lieutenant Perkins completed an annual review of Plaintiff's work performance that was generally positive. On or about May 1, 2017, Defendant Carignan allegedly instructed Lieutenant Perkins to alter his review to reflect a more negative opinion; when he refused to do so, Defendant Carignan added an unwarranted and discriminatory negative supplement to Plaintiff's review.

Plaintiff alleges that on or about June 8, 2017, Defendant Carignan informed her that she would be subjected to a disciplinary suspension and loss of pay because she pursued a motorist with a suspended driver's license who was driving at a high rate of speed at night without headlights on the wrong side of the road. Plaintiff further alleges that male officers have not been disciplined for pursuing motorists in comparable situations.

Plaintiff asserts that she was a member of the Bicycle Special Team for many years while she was employed by Brattleboro PD. The other member of the team is a female colleague. Plaintiff alleges that Brattleboro PD has six other special teams and the male officers on those teams receive a $500 annual stipend in exchange for their services. Plaintiff further alleges that she and her female colleague requested and were denied the same stipend for their work.

Certified as the sole female Field Training Officer ("FTO") in 2004, Plaintiff asserts that she was entitled to a $500 annual bonus, but Brattleboro PD refused to use her as an FTO and, on that basis, denied her the bonus although similarly situated male colleagues received one. She is also the only certified FTO that Brattleboro PD refused to use for a non-disciplinary reason.

Although she made repeated attempts to address the alleged unlawful harassment by making complaints to supervisors and filing grievances, Plaintiff claims Defendants Elwell and Moreland, who were aware of her complaints, failed to direct Brattleboro PD to take corrective action. On or about June 7, 2017, the Town allegedly retained Stephen Ellis, Esq. to investigate Plaintiff's complaints. Plaintiff met with Attorney Ellis and cooperated with the investigation, but the Town refused to provide her with a copy of his report.

7

Plaintiff states her health was affected by the alleged harassment and that she was treated by a therapist for depression as a result of Defendants' actions. On June 27, 2017, Plaintiff filed a complaint with the EEOC alleging that she was being discriminated against on the basis of her gender. Following an investigation, on April 19, 2018, the EEOC issued Plaintiff a Notice of Right to Sue. On or about August 10, 2018, Plaintiff alleges she was forced to resign because of a hostile work environment created by Defendants. She seeks back pay, lost wages, retroactive benefits, injunctive relief, compensatory and punitive damages, and attorney's fees and costs.

## II. Conclusions of Law and Analysis.

This court has jurisdiction over Plaintiff's federal claim pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiff's state law claim pursuant to 28 U.S.C. § 1367(a) because those claims "derive from a common nucleus of operative facts" as her federal claims. *Shahriar v. Smith & Wollensky Restaurant Grp., Inc.*, 659 F.3d 234, 245 (2d Cir. 2011). Plaintiff's VFEPA claim is governed by Vermont law. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 n.4 (2d Cir. 2006) ("[T]he Erie doctrine applies, whatever the ground for federal jurisdiction, to any issue or claim which has its source in state law. Thus, we apply [state] law, even though our jurisdiction rests solely upon [28 U.S.C.] § 1367.") (internal quotation marks and citations omitted).

### A. Standard of Review.

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017) (internal quotation marks omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In determining whether a claim is plausible, the court draws upon its "judicial experience and common sense." *Id.* at 679.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

8

misconduct alleged." *Id.* at 678. Under Fed. R. Civ. P. 12(b)(6), the court "constru[es] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Elias*, 872 F.3d at 104 (internal quotation marks omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted).

## B. Whether Plaintiff's Title VII Claims Against the Individual Defendants Should Be Dismissed.

Defendants Moreland, Elwell, Fitzgerald, and Carignan contend that Plaintiff's Title VII claims against them must be dismissed because Title VII does not permit suits against individuals. Plaintiff does not cite authority to the contrary.

"Title VII does not create liability in individual supervisors and co-workers who are not the plaintiffs' actual employers." *Littlejohn v. City of New York*, 795 F.3d 297, 313 (2d Cir. 2015) (internal quotation marks omitted); *see also Mandell v. Cty. of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003) ("[T]he district court's dismissal of plaintiff's Title VII claims against Gallagher in his personal capacity must be affirmed because under Title VII individual supervisors are not subject to liability."); *Lore v. City of Syracuse*, 583 F. Supp. 2d 345, 359 (N.D.N.Y. 2008) ("Although individual liability for workplace discrimination is sometimes possible under various state and federal causes of action, controlling precedent holds there is no individual liability under Title VII."). The motions to dismiss Plaintiff's Title VII claims against Defendants Moreland, Elwell, Fitzgerald, and Carignan are therefore GRANTED.

## C. Whether Plaintiff's Title VII Claims are Time-Barred.

The Town asserts that Plaintiff's claims based on alleged adverse employment acts and omissions that took place prior to October 4, 2016 are barred by the applicable statute of limitations because Plaintiff was required to file her charge of discrimination with the EEOC within 300 days of the unlawful employment action. *See Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 712 (2d Cir. 1996) ("Title VII requires a claimant to file a charge of discrimination with the EEOC within 180 days of the alleged unlawful

9

employment action or, if the claimant has already filed the charge with a state or local equal employment agency, within 300 days of the alleged discriminatory action."). The Town contends that the following adverse employment actions are therefore time-barred:

(1) The Town demoting Plaintiff from her rank as sergeant and removing her from the Detective Unit; (2) demotion of Plaintiff from her rank as lieutenant; (3) refusal to award the female only special team of which Plaintiff was a member an annual bonus accorded to the male only special teams; (4) refusal to award Plaintiff the annual instructor bonus awarded to her similarly-situated male counterparts; [and] (5) the initial five months during which Plaintiff was required to provide advance notice of a need to alter her work schedule and which was not required of her similarly-situated male colleagues.

(Doc. 45 at 8.)

Plaintiff does not dispute that her Title VII claims based on adverse employment actions beyond 300 days of her filing are time-barred but responds that those same events may be considered as background to her timely claims. Discriminatory adverse employment actions taken prior to the actionable period may be considered in this manner. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 102 (2002) ("Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim."); *Fitzgerald v. Henderson*, 251 F.3d 345, 365 (2d Cir. 2001) ("A statute of limitations does not operate to bar the introduction of evidence that predates the commencement of the limitations period but that is relevant to events during the period.").[2]

Because Plaintiff does not seek to assert claims for adverse employment actions prior to October 4, 2016, the Town's motion to dismiss Title VII claims based on those events is GRANTED, however, allegations regarding these events may be considered in support of Plaintiff's other claims.

---

[2] Evidence of time-barred events may also be admissible as other bad acts under Fed. R. Evid. 404(b). *See Duplan v. City of New York*, 888 F.3d 612, 626 (2d Cir. 2018) ("Duplan alleges that each of the adverse actions alleged above occurred against a backdrop of continuing antagonism and frustration of his professional ambitions. . . . Those allegations establish a drumbeat of retaliatory animus from which a plausible inference of causation can be drawn.").

### D.    Whether Plaintiff's VFEPA Claims are Time-Barred.

The Town asserts that Plaintiff's claims for emotional distress arising from alleged conduct that took place prior to July 16, 2015 are time-barred because they are subject to a three-year statute of limitations. *See* 12 V.S.A. § 512(4) (imposing a three-year statute of limitations for "injuries to the person suffered by the act or default of another person"). Defendant Carignan's alleged attempt to kiss Plaintiff in 2003, as well as Plaintiff's interactions with Defendant Moreland in 2013 and early 2014, thus fall outside the actionable period. The Town also points out that any economic damages arising from adverse employment actions that occurred more than six years before the Complaint was filed are also time-barred. *See* 12 V.S.A. § 511 ("A civil action . . . except as otherwise provided, shall be commenced within six years after the cause of action accrues and not thereafter.").

In response, Plaintiff states that the Town mischaracterizes her claims and contends that the Town "is liable for these actions as part of a hostile work environment[.]" (Doc. 45 at 10.) She contends that her gender discrimination and disparate treatment claims are based on a failure to pay for her work with the special team; refusing to pay her an FTO-related annual bonus; restrictions on her ability to adjust her work schedule; subjecting her to an unwarranted internal investigation; and Defendant Carignan's negative work evaluation. Because Plaintiff asserts claims which are within the six-year statute of limitations, the Town's motion to dismiss Plaintiff's VFEPA claims as time-barred is GRANTED as to those adverse employment actions outside the applicable statute of limitations and DENIED as to the remainder. As with her Title VII claims, Plaintiff's time-barred allegations may remain in the Amended Complaint as background information in support of her timely claims.

### E.    Whether Plaintiff Failed to Plausibly Allege Her Title VII and VFEPA Claims.

Plaintiff contends that Defendants violated Title VII and VFEPA by discriminating against her on the basis of her gender. With regard to the alleged Title VII violation, Plaintiff asserts that Defendants created a hostile work environment, denied her

11

economic benefits, subjected her to adverse employment actions because she complained of sexual harassment in the workplace, and constructively discharged her. She cites the following alleged adverse employment actions within the actionable period: (1) the five-day notice requirement for her to make changes to her work schedule from October 4, 2016 through June 5, 2017; (2) the November 6, 2016 counseling session to address performance issues for which she was not responsible; (3) the March 2017 internal affairs investigation for shooting a rabid cat; (4) the June 8, 2017 notice of discipline for her pursuit of a dangerous driver and a disciplinary suspension; (5) the refusal to pay her an annual bonus for her work on the special team; and (6) her constructive discharge. Defendants respond that Plaintiff has alleged insufficient facts to plead discriminatory intent, her adverse employment actions do not constitute adverse employment actions under Title VII, and her voluntary resignation unaccompanied by a complaint of harassment was not a constructive discharge.

Title VII makes it unlawful for employers "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1).

At the pleading stage, the Second Circuit has held that "the allegations in the complaint need only give plausible support to the reduced prima facie requirements that arise under *McDonnell Douglas* in the initial phase of a Title VII litigation." *Littlejohn*, 795 F.3d at 316.

[A]t the initial stage of the litigation—prior to the employer's coming forward with the claimed reason for its action—the plaintiff does not need substantial evidence of discriminatory intent. If she makes a showing (1) that she is a member of a protected class, (2) that she was qualified for the position she sought, (3) that she suffered an adverse employment action, and (4) can sustain a *minimal* burden of showing facts suggesting an inference of discriminatory motivation, then she has satisfied the prima facie requirements and a presumption of discriminatory intent arises in her favor, at which point the burden of production shifts to the employer, requiring that the employer furnish evidence of reasons for the adverse action.

12

*Id.*

The Second Circuit has "defined adverse employment action broadly to include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001) (internal quotation marks omitted); *see also Boza-Meade v. Rochester Hous. Auth.*, 170 F. Supp. 3d 535, 552 (W.D.N.Y. 2016) (describing adverse employment actions as "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation.") (internal quotation marks omitted).

To qualify as an adverse employment action, the event must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (internal quotation marks omitted). However, termination or constructive discharge is not required because "lesser actions may be considered adverse employment actions [including] . . . negative evaluation letters, express accusations of lying, assignment of lunchroom duty, [and] reduction of class preparation periods[.]" *Lovejoy-Wilson*, 263 F.3d at 223 (internal quotation marks omitted). "[W]orkplace sabotage and punitive scheduling claims, if believed by a jury, constitute 'adverse employment actions' for purposes of the third element of plaintiffs' *prima facie* case." *Hicks v. Baines*, 593 F.3d 159, 170 (2d Cir. 2010) ; *see also Duplan v. City of New York*, 888 F.3d 612, 627 (2d Cir. 2018) (finding plaintiff alleged a claim for retaliation in part because "the City assigned him duties well below his civil service and functional titles").

"Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily." *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir. 1996). "[W]orking conditions are intolerable when, viewed as a whole, they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Terry v. Ashcroft*, 336 F.3d 128, 152 (2d Cir. 2003) (internal quotation marks omitted). The Second Circuit, however, has also held

that "[t]he environment need not be 'unendurable' or 'intolerable.' In brief, the fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious cases." *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004) (internal quotation marks omitted).

> [I]n a gender-based hostile work environment case like the one before us, the crucial question is not simply whether the remarks to which plaintiffs were subjected were of an explicitly sexual nature. It is rather whether the workplace atmosphere, considered as a whole, undermined plaintiffs' ability to perform their jobs, compromising their status as equals to men in the workplace.

*Dawson v. Cty. of Westchester*, 373 F.3d 265, 274 (2d Cir. 2004). "Because there are no bright-line rules, courts must pore over each case to determine whether the challenged employment action reaches the level of 'adverse.'" *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997).

> To state a claim for a hostile work environment in violation of Title VII, a plaintiff must plead facts that would tend to show that the complained of conduct: (1) is objectively severe or pervasive—that is, . . . creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's sex.

*Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (internal quotation marks omitted). "Proving the existence of a hostile work environment involves showing both objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Feingold*, 366 F.3d at 150 (internal quotation marks omitted). Under Title VII, "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." *Nat'l R.R. Passenger Corp.*, 536 U.S. at 105 (internal quotation marks omitted).

Among the factors the United States Supreme Court considers are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or

14

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with [the] employee's work performance." *Id.* at 117. (internal quotation marks omitted).

> Title VII comes into play before the harassing conduct leads to a nervous breakdown. A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. Moreover, even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality.

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993).

Although "[s]eparate acts are not properly treated as part of a single hostile work environment practice if they are 'qualitatively different' from one another[,]" *Kimball v. Vill. of Painted Post*, 737 F. App'x 564, 568 (2d Cir. 2018), "[t]he Supreme Court has held that a work environment's hostility should be assessed based on the 'totality of the circumstances.'" *Patane*, 508 F.3d at 113.

At the pleading stage, a plaintiff's allegations "need only give plausible support to a minimal inference of discriminatory motivation." *Littlejohn*, 795 F.3d at 311. As a result, "[a]n inference of discrimination can arise from circumstances including, but not limited to . . . invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Id.* at 312 (internal quotation marks omitted). The Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship[.]" *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cty.*, 252 F.3d 545, 554 (2d Cir. 2001).

VFEPA makes it unlawful "[f]or any employer, employment agency, or labor organization to discriminate against any individual because of race, color, religion, ancestry, national origin, sex, sexual orientation, gender identity, place of birth, crime victim status, or age or against a qualified individual with a disability[.]" 21 V.S.A. § 495(a)(1). "All employers, employment agencies, and labor organizations have an

obligation to ensure a workplace free of sexual harassment." 21 V.S.A. § 495h(a)(1). "[V]FEPA is patterned on Title VII of the Civil Rights Act of 1964, and the standards and burdens of proof under [V]FEPA are identical to those under Title VII." *Hodgdon v. Mt. Mansfield Co.*, 624 A.2d 1122, 1128 (Vt. 1992).

The Town asserts that Plaintiff fails to state a claim under either Title VII or VFEPA because, as a matter of law, the alleged conduct "was neither frequent nor severe, nor physically threatening or humiliating, and it did not unreasonably interfere with Plaintiff's work performance[,]" (Doc. 36-1 at 20) and because Plaintiff improperly characterized neutral actions as discriminatory. The Town contends that, even if accepted as true, Defendant Fitzgerald's yelling and swearing at Plaintiff, Defendant Carignan's negative job performance evaluation, and discipline for violating the policy regarding high speed pursuits had no relationship to Plaintiff's gender. The Town further contends that the isolated disciplinary actions, advances made by two male colleagues, and sporadic vulgar workplace banter are insufficient to adequately allege a hostile work environment.[3]

---

[3] The Town cites the same decision-maker doctrine in support of its argument that there was no discriminatory intent, pointing out that the supervisors who promoted Plaintiff are the same individuals who demoted her. The same decision-maker doctrine states that "if the person who fires an employee is the same person that hired him, one cannot logically impute to that person an invidious intent to discriminate against the employee." *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 137 (2d Cir. 2000) (internal quotation marks omitted). "The underlying rationale for the inference is simple: it is suspect to claim that the same manager who hired a person in the protected class would suddenly develop an aversion to members of that class." *Ramos v. Marriott Int'l., Inc.*, 134 F. Supp. 2d 328, 345 (S.D.N.Y. 2001) (internal quotation marks omitted). This doctrine, while relevant, does not foreclose a discrimination claim because, "[e]ven if the 'same actor inference' applies to Title VII claims, it would not necessarily apply here given the changes in circumstances during the course of [plaintiff's] employment." *Feingold v. New York*, 366 F.3d 138, 154-55 (2d Cir. 2004) (footnote omitted). "[T]he same-actor inference is merely plausible and should not be used as a substitute for a thorough factual inquiry." *Ramos*, 134 F. Supp. 2d at 346. "The 'same actor' inference is not a necessary inference, . . . and decisions in this Circuit addressing it have warned that its use is not to become a substitute for a fact-intensive inquiry into the particular circumstances of the case at hand." *Copeland v. Rosen*, 38 F. Supp. 2d 298, 305 (S.D.N.Y. 1999) ("[I]t is plausible that a supervisor who has not previously worked with members of a certain protected class would come to realize his or her animus toward individuals in that group only upon actually hiring and working with such persons.").

16

"[T]o avoid dismissal under [Fed. R. Civ. P.] 12(b)(6), a plaintiff need only plead facts sufficient to support the conclusion that she was faced with harassment . . . of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse[.]" *Patane*, 508 F.3d at 113 (internal quotation marks omitted). "[T]he pervasive use of derogatory and insulting terms directed at members of a protected class generally, and addressed to those employees personally, may serve as evidence of a hostile environment." *Aman v. Cort Furniture Renal Corp.*, 85 F.3d 1074, 1083 (3d Cir. 1996). The Second Circuit has "repeatedly cautioned against setting the bar too high in this context." *Patane*, 508 F.3d at 113 (internal quotation marks omitted).

Plaintiff alleges an array of sexist comments, inferior treatment, and adverse employment actions motivated by a discriminatory animus toward her gender as evidenced by discriminatory treatment of not only herself but other female officers of the Brattleboro PD.[4] At the pleading stage, she plausibly alleges discrimination that is sufficiently pervasive or severe to create a hostile work environment. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 n.8 (2007) ("[W]hen a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder."). Accordingly, arguments that Plaintiff was too "thin skinned" or misperceived neutral events must await a more complete factual record. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 69 (1986) ("The EEOC Guidelines emphasize that the

---

[4] For example, Plaintiff alleges that throughout her employment, in her presence, her male colleagues discussed "whether they would like to 'stick it in' certain women[,]" (Doc. 18 at 4, ¶ 28), and the "size and/or attractiveness of certain women's breasts[.]" *Id.* at 4, ¶ 27. Plaintiff further alleges she was told that she was not permitted at the male officers' social hunting event but instead told to join the social group of police officers' wives. The locker room where the female officers were assigned lockers was "regularly and openly referred to as 'the twat cave' by both colleagues and supervisors." *Id.* at 4, ¶ 25. Throughout Plaintiff's employment at Brattleboro PD, officers allegedly made derogatory gender-based comments to Officer Amy Hamilton and Defendants Carignan and Fitzgerald were either aware of or participated in this conduct or did nothing to prevent or respond to it. Plaintiff also alleges that the misogynistic attitudes of her supervisors and colleagues made it difficult to assert her supervisory authority after she was promoted to sergeant and that she was held to a higher standard than her similarly situated male colleagues.

17

trier of fact must determine the existence of sexual harassment in light of the record as a whole and the totality of circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred.") (internal quotation marks omitted).

Plaintiff further alleges that she was treated differently than her similarly situated male colleagues regarding her use of sick leave, her ability to change her work schedule, and in her performance evaluations. Plaintiff plausibly alleges that Defendants' actions were "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Brown*, 673 F.3d at 150 (internal quotation marks omitted); *see also Ferrand v. Credit Lyonnais*, 2003 WL 22251313, at \*4 (S.D.N.Y. Sept. 30, 2003) (finding plaintiff's "much decreased bonus compensation" constituted an adverse employment action), *aff'd*, 110 F. App'x 160 (2d Cir. 2004). In any event, "adverse employment actions are not limited to pecuniary emoluments." *Lovejoy-Wilson*, 263 F.3d at 223 (internal quotation marks omitted). Although the Town asserts that Plaintiff's allegations over the sixteen-year period are qualitatively different, collectively they "might well be viewed by a reasonable jury not simply as an isolated incident but as a tangible extension of the pervasive demeaning [treatment of plaintiff] personally." *Petrosino v. Bell Atl.*, 385 F.3d 210, 224 (2d Cir. 2004).

Because Plaintiff has sufficiently alleged "harassment . . . of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse," *Patane*, 508 F.3d at 113 (internal quotation marks omitted), she has alleged the "necessary predicate" to a constructive discharge claim. *Penn. State Police v. Suders*, 542 U.S. 129, 149 (2004) ("Creation of a hostile work environment is a necessary predicate to a hostile-environment constructive discharge case."). Having satisfied her *prima facie* pleading burden for her Title VII and VFEPA claims, Defendants' motions to dismiss these claims on plausibility grounds are DENIED.

## F. Whether Plaintiff's VFEPA Claims Against the Individual Defendants Should Be Dismissed.

Defendants Moreland, Elwell, Fitzgerald, and Carignan request dismissal of Plaintiff's VFEPA claims against them because they are not subject to individual liability

18

as town and municipal officials and employees. The Vermont Supreme Court has held that "by including the phrase 'and any agent' in the definition of 'employer,' the VFEPA allows for suits against employees as individuals." *Payne v. U.S. Airways, Inc.*, 987 A.2d 944, 953 (Vt. 2009).

> Where an action is given to any appointed or elected municipal officer or town school district officer, the action shall be brought in the name of the town in which the officer serves and in the case of a town school district officer in the name of the town school district. If the action is given against such officers, it shall be brought against such town or town school district, as the case may be.

24 V.S.A. § 901(a). "The municipality shall assume all reasonable legal fees incurred by an officer when the officer was acting in the performance of his or her duties and did not act with any malicious intent." 24 V.S.A. § 901(b).

> When the act or omission of a municipal employee acting within the scope of employment is alleged to have caused damage to property, injury to persons, or death, the exclusive right of action shall lie against the municipality that employed the employee at the time of the act or omission; and no such action may be maintained against the municipal employee or the estate of the municipal employee.

24 V.S.A. § 901a(b). Municipal immunity "is qualified in the sense that it requires several elements, including a showing that the government officials were 1) acting during the course of their employment and . . . within the scope of their authority; 2) acting in good faith; and 3) performing discretionary, as opposed to ministerial acts." *O'Connor v. Donovan*, 2012 VT 27, ¶ 6, 191 Vt. 412, 416-17, 48 A.3d 584, 586-87 (internal quotation marks omitted).

In adjudicating a motion to dismiss under VFEPA, this court has determined that "Section 901a of Title 24 has no application because it contains an exception for conduct that was willful, intentional, or outside the scope of the employee's authority. Discrimination on the basis of age or gender would fall within the exception." *Bain v. Wrend*, 2018 WL 5980376, at *7 (D. Vt. Nov. 14, 2018) (citation and internal quotation marks omitted). Here, each of the individual Defendants is alleged to have acted willfully and intentionally in their alleged gender-based discrimination against Plaintiff.

19

The individual Defendants' further argument that Plaintiff has not alleged their personal involvement is similarly unavailing because, for each of them, Plaintiff alleges personal involvement in the alleged discriminatory conduct that is not time-barred. For example, with regard to Defendant Moreland, Plaintiff contends that he fostered the hostile work environment at Brattleboro PD through his role as the Town's Assistant Manager, condoned the ongoing sexual harassment of Plaintiff, and failed to take corrective action, or to direct the Brattleboro PD to take corrective action. With regard to Defendant Fitzgerald, Plaintiff alleges he had a significant role in permitting the hostile work environment which led to her resignation based upon a May 2017 incident in which he ordered her to meet with him to discuss her use of sick leave, allegedly verbally abused her, and embarrassed her in front of her co-workers and subordinate officers. She further alleges that Defendant Fitzgerald was aware of the alleged sexist remarks made by her colleagues regarding "Amy Cameltoe" and "the twat cave," but did not prevent or respond to them despite the alleged authority to do so. Plaintiff alleges that Defendant Elwell participated in and condoned the hostile work environment at Brattleboro PD because he was aware of the grievances and complaints she filed, oversaw all of the disciplinary and hiring decisions that were made during her tenure, and did not act to correct any of the issues she raised.

Because the court must "constru[e] the complaint liberally, accept[] all factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor[,]" *Elias*, 872 F.3d at 104 (internal quotation marks omitted), the motions to dismiss Plaintiff's VFEPA claim filed by Defendants Moreland, Fitzgerald, Elwell, and Carignan are DENIED.

## G. Whether Plaintiff May Seek Punitive Damages Against the Town.

The Town asserts that punitive damages are not available as a remedy against it under either Title VII or VFEPA. Plaintiff does not address this argument. Under 42 U.S.C. § 1981a(b)(1), punitive damages are not available against a government, government agency, or political subdivision. Under Vermont law, "municipal corporations cannot be held liable for punitive damages." *In re Town Highway No. 20*,

20

2012 VT 17, ¶ 72, 191 Vt. 231, 271, 45 A.3d 54, 80. Plaintiff's punitive damages claim against the Town is therefore DISMISSED.

## CONCLUSION

For the foregoing reasons, the court GRANTS IN PART and DENIES IN PART the motions to dismiss. (Docs. 22, 35, 36, 37, 38, 39, 40.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this _13th_ day of June, 2019.

Christina Reiss, District Judge
United States District Court